## Elkhorn Coal Corporation v. Bradley, et al.

(Decided November 16, 1926.)

## Appeal from Floyd Circuit Court.

1. Mines and Minerals—Agreement Providing that it Should be Void if Mineral Rights Conveyed were Not Paid for Within Certain Time, Held a Conditional Sale and Agreement to Convey Granting Option to Purchase.—Sale of mineral rights, providing that it should be void if purchase price was not paid in six months, held a conditional sale and agreement to convey granting an option to purchase tract at price specified to be exercised within certain time.

2. Wills—Testimony Held to Overcome Suspicion that Document Giving Property in Dispute to Plaintiff's Grantor was Not Genuine Because its Appearance indicated that it was Fabricated.— Testimony of both interested and disinterested witnesses as to seeing questioned document when it was executed, purporting to will to plaintiff's grantor land in controversy, together with fact that heirs of decedent made no claim to such land on his death, held sufficient to overcome any suspicion that document was not genuine because its appearance indicated that it had been fabricated.

3. Evidence—Title Bond Over 30 Years Old Held Admissible, Under "Ancient Document" Rule.—Title bond over 30 years old held admissible, under "ancient document" rule permitting its introduction in evidence without direct proof of execution, if it appears to be at least 30 years old, is found in proper custody, and is unblemished by alterations and otherwise free from suspicion.

4. Estoppel—Signature of Person to Option Granting Mineral Rights can Operate to Estop Him from Claiming Such Rights Only as Long as Option Remains Valid, and Attempted Revival of Option Without His Knowledge is Ineffective to Create Further Estoppel. —Where option to purchase mineral rights was not exercised within time specified by defendant's remote grantor, signature by plaintiffs' grantor to option could operate to estop him from claiming mineral rights under land on which he was living only as long as option was valid, and attempted revival of option without his knowledge was ineffective to create further estoppel.

5. Adverse Possession—Actual Possession of Land on which Claimant Lived in his Own Home Held as Open, Notorious and Hostile as Possible.—Actual possession by grantee, under unrecorded instrument, in full management and control of land which he cultivated and fenced and on which he actually lived in his own home held as open, notorious and hostile as possible.

6. Champerty and Maintenance—Conveyance of Mineral Rights in Disputed Land Subsequent to Unrecorded Conveyance to Plaintiffs' Grantor, who was in Adverse Possession at Time, Held Champertous and Void (Kentucky Statutes, Section 210).—Where plain-

tiffs' immediate grantor was in adverse possession of disputed land after paying for it and receiving unrecorded conveyance from his father, subsequent conveyance by father of mineral rights to defendant's remote grantor held champertous and void, under Kentucky Statutes, section 210.

O'REAR, FOWLER & WALLACE, JAMES & WALLEN and E. W. PENDLETON for appellant.

A. B. COMBS for appellees.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Affirming.

Ownership of the coal and minerals in and under a certain 100 acres of land in Floyd county, Kentucky, is in issue herein. Appellees instituted the action to quiet their title, and appellant by counterclaim sought the same relief. The parties trace their title to a common source. William Bradley, through whom both parties claim, appears to have owned a large tract of land in Floyd county; and appellant claims title to the coal and minerals under a deed from him to Walter S. Harkins, dated June 30, 1890, which purported to convey the minerals in and under his entire boundary, including the 100 acres claimed by appellees, and the right to a conveyance thereof which accrued under an instrument of writing, the effect of which is in controversy, which William Bradley executed and delivered to one R. W. Harris on August 23, 1887, and a supplemental writing endorsed thereon October 26, 1889. Appellees claim under what they term a title bond executed and delivered by William Bradley to James Bradley, dated August 24, 1888, and continuous, actual, open, notorious and adverse possession thereunder ever since.

The chancellor upon the trial below adjudged that appellees, who were plaintiffs below, are the owners of the minerals in and under the 100 acres in controversy, quieted their title, and dismissed appellant's counterclaim. Hence the appeal.

On August 23, 1887, William Bradley, who then owned the legal title and was in possession of a large tract of land estimated to contain 305 acres, executed and delivered to R. W. Harris the paper under which, as appellant claims, the equitable title and right to a conveyance of the coal and minerals thereunder first arose

in favor of its remote grantor, W. S. Harkins.  It recited that William Bradley, in consideration of $8.35 paid, and 52½ cents per acre to be paid upon the acreage of the tract being ascertained by survey to be made by Harris, "on conditions hereinafter stated have sold to R. W. Harris all the coal, metal and mineral products on and under" the land described.  The conditions under which the sale was made were: "If the said R. W. Harris, or his assigns, shall not within 6 months from date hereof pay, or cause to be paid to said William Bradley, his heirs or assigns, the sum of 52½ cents per acre, as ascertained by survey of land herein described, then this bond and all agreements pertaining to same to become void." It was further provided that if Harris should make payment as specified Bradley would convey all the coal, metal and mineral products on or under the described tract of land.  The most that can be said is that the instrument in question was a conditional sale and agreement to convey, which in effect granted to Harris the option to purchase the tract of land at the price of 52½ cents per acre, provided he would exercise the option or perform the conditions within 6 months from its date.

By the instrument itself William Bradley and R. W. Harris only were made parties to it.  William Bradley appears to have signed it by mark, and the names of Riley Bradley and James Bradley appear signed to it immediately under the name of William Bradley.  James Bradley, who so appears to have signed it, is the same James Bradley to whom William Bradley subsequently conveyed the 100 acre tract in controversy herein, through whom and through which conveyance appellees claim the coal and minerals in and under it.  The parties hereto take opposing positions as to the significance to be attached to the fact that James Bradley signed that paper.  Appellees insist that he was required to sign it by Harris, to whom the option to purchase the minerals was granted, because he then was living in his own home, separate and apart from his father, on the 100 acre tract included in the larger boundary, which gave notice of his claim to ownership, and in order that if the option should be exercised he also could be compelled to join in the deed of conveyance.  Appellant contends that James Bradley signed merely as a witness, since he was not made a party to the instrument by its own terms, and that his having

so signed was his representation to Harris and those claiming under him that, though living in a separate home on the large boundary of land mentioned in the instrument, he made no claim to ownership of any part of it. Hence that he is estopped. A determination of what effect must be given to the fact that James Bradley signed the instrument in question seems to be unnecessary, because, conceding appellant all that it contends with reference thereto, if James Bradley signed merely as a witness and thereby in effect represented to Harris that though he was living in a separate home on the large boundary of land described in the option he made no claim to ownership of any part of it, that situation could be held to obtain no longer than the instrument which he signed which created it was valid. Harris does not appear to have exercised his option to purchase the coal and minerals under the William Bradley tract of land or to have met the conditions imposed upon him by the conditional sale and agreement to convey within six months. From the record herein Harris does not appear to have taken any of the steps required by the terms of his option or conditional purchase within the period of six months from its date. Nothing else appears to have been done until the 26th day of October, 1889, nearly 18 months after the option had expired, when there was endorsed on it a writing which recited receipt of $5.00, in consideration of which the time for surveying the tract of land was extended 30 days from that date. That endorsement was signed by William Bradley alone, and the record does not establish that James Bradley, through whom appellees claim, had any knowledge that the extension of time was given or that the option which was originally granted to Harris which he had signed as above indicated was in that way attempted to be revived by the parties. The record does not establish that the surveying which Harris was to do to establish the boundary and ascertain the acreage of William Bradley's tract of land was done within the 30 days from the date of the endorsement on the original instrument. The deed by which William Bradley purports to convey the coal and minerals under his large boundary of land, which included the 100 acres claimed by appellees, was not executed until June 30, 1890, and then was made, not to R. W. Harris, mentioned in the option and endorsement on it, but to W. S. Harkins. No connection between Harris

and Harkins is established by the evidence herein except that Joseph D. Harkins, a son of W. S. Harkins, testified that he found among the papers in his father's files the original deed from William Bradley to him dated June 30, 1890, which purports to convey the coal and minerals under the entire William Bradley 305 acres, and also the option or conditional contract of purchase above mentioned, with the endorsed extension from William Bradley to R. W. Harris. No assignment of the Harris option to Harkins appears and any connection between the two must be supplied by the mere fact in evidence that the option to Harris and the deed to Harkins were both found among the papers of W. S. Harkins, who died some time since.

Appellees file as evidence herein and rely for their title to the coal and minerals under the 100 acre tract of land claimed by them the following instrument of writing:

"Be it known by these presents that I William Bradley of the first party do this day sell to James Bradley his son of the second party a tract of land lying on Caney creek for the sum of $150.00 One Hundred and Fifty Dollar*d* Paid in hand. This Land is Bounded as follows: beginning with Edward Ousley Land on the upper end and running up a drean to the top of the hill thence with the ridge around the head of the Branch to Elliott Hamilton Land thence Straight down the hill to Caney Creek thence up the creek to the beginning this being the 24th day Aug., 1888. Given under my hand Jesse Justice

his

Steve Hamilton          William X Bradley

Att ·          mark

High Bradley          her

Green Bradley, Jr.   Bettie X Bradley."

mark

It is established and not disputed that the description contained therein covers the 100 acre tract of land, the coal and minerals under which are in controversy herein. The evidence for appellees establishes further —and there is none to the contrary—that James Bradley, party of the second part therein, actually resided upon the tract of land therein described from the date of the instrument continuously to the date of his death,

which occurred some eight or ten years ago; that he died intestate; and that following his death appellee, Harris Bradley, his son, purchased and took deed of conveyance for the interest of all the other children who were 21 years of age, and that he and the other appellees, who are James Bradley's children, not yet 21 years of age, have actually resided upon the tract of land in question from the date of his death until now. The evidence establishes that during all of that long period of time, approximately 40 years, James Bradley and his surviving heirs and the appellees have exercised every act of ownership possible to give open and notorious notice of the adverse character of their holding. The title bond was not acknowledged and was never recorded. Its execution was established by the evidence of Hi Bradley, one of the witnesses to it. The evidence establishes that it was delivered to James Bradley and remained in his possession in a trunk in his home on the 100 acre tract throughout his life and until filed as evidence herein. Appellant himself testified that he had seen the title bond in his youth in his father's possession. Henry C. Stephens, who was, so far as the record discloses, a wholly disinterested witness, testified that approximately 20 years ago he purchased from James Bradley the white oak and chestnut oak timber on the 100 acre tract of land after counting and branding it. In obtaining conveyance of the timber so purchased and while at Bradley's home he was shown the title bond from William to James Bradley. He identified the writing filed in evidence herein as the same that James Bradley then showed him as evidence of his title to the 100 acre tract of land. The evidence herein further establishes that when William Bradley died, though he left a large family of children surviving him, all of them recognized that he had previously conveyed the 100 acre tract in controversy to James Bradley, because none of them ever set up any claim to it or any part of it as a part of William Bradley's estate. No evidence was introduced herein by appellant tending in the least to impeach the genuineness and validity of the conveyance from William Bradley to James Bradley. Appellant insists, however, that the appearance of the document itself is evidence that it was written much later than its date indicates and furnishes evidence that it was fabricated and "doctored" to appear to be old, so convincing that the court should disregard it altogether.

Especial stress is laid upon the fact that the ink with which the writing was done does not appear to be as old as the date of the instrument indicates. The original document has been brought here for the inspection of the court, and we are not prepared to say that its appearance creates the suspicion that appellant seeks to cast upon it. To support it we have the testimony of the witness, interested though he be, who was present when it was executed. We have the further evidence of the witness, wholly disinterested so far as the record discloses, who purchased the timber from the land in controversy of James Bradley 20 years or more ago, who testified that he then saw the questioned document. We have further the strongest circumstance of all, when William Bradley died his numerous other heirs made no claim to the 100 acre tract of land as a part of their intestate's estate. These evidences of the genuineness of the questioned document are much more than sufficient to overcome any suspicion that it is not genuine which might arise when it is examined in the light of the suggestion that its appearance indicates that it has been fabricated. Aside from the evidence of the witness Hi Bradley establishing the execution and delivery of the questioned document it was clearly admissible in evidence herein under the "ancient document" rule, which permits their introduction in evidence without direct proof of execution if they appear to be of the age of at least 30 years, are found in the proper custody and are unblemished by alterations and otherwise free from suspicion. See Cooper v. Williamson, 191 Ky. 213, 229 S. W. 707; James v. Davis, 172 Ky. 381, 189 S. W. 440; Russell v. Tipton, 193 Ky. 305, 235 S. W. 736; Fulkerson v. Holmes, 117 U. S. 389.

Summarizing, the record herein establishes that the option or conditional right to purchase and conveyance of the coal and minerals under the William Bradley 305 acre tract of land granted to R. W. Harris August 23, 1887, expired February 23, 1888, for failure upon the part of Harris to perform its conditions. James Bradley's signing that writing, if given the effect insisted upon by appellant to operate as an estoppel against his claiming to own the coal and minerals under the land on which he was then living as against the grantee of the rights granted by it, can be held to have so operated no longer than the rights granted were valid under its terms.

When it expired, all the effect that could be given to the fact that James Bradley had signed it likewise expired. Approximately six months after it expired and approximately a year before it was attempted to be revived by the endorsement written on it which William Bradley alone signed, the latter, who then owned the 305 acre tract, freed of all liability imposed by the option previously granted to Harris, executed and delivered to James Bradley, the ancestor of appellees herein, the above quoted instrument conveying to him the 100 acre tract, the coal and minerals in which are in controversy. The writing was immediately delivered to James Bradley, and claiming under it he and appellees have been in actual possession of the land described by actual residence thereon and use thereof from its date to this day. James Bradley, who thus acquired the 100 acre tract of land, is not shown to have been present or to have known of the attempted effort to revive the expired option when, on October 26, 1889, and more than a year after he had purchased, paid for and received conveyance of the 100 acre tract of land, the writing was endorsed on the original option which purported to grant R. W. Harris 30 days' additional time from that date to comply with its conditions. Neither is he shown to have been present or to have known anything about the execution of the deed from William Bradley to W. S. Harkins on June 30, 1890, some seven months after the expiration of the 30 day extension endorsed on the original option.

The facts hereof clearly distinguish this case from Phillips v. Hopkins, 208 Ky. 769. There those who were claiming under the unrecorded deed were shown by the evidence not to have been in the adverse possession of the land they claimed at the time the subsequent deed was made, which they asserted was champertous. They were claiming under an unrecorded deed from their father, and it was held that the evidence of their adverse possession thereunder was not sufficient because it established that they were living in the home with their father, who was the owner of the legal title of record and who had full possession and control of all of it. In that opinion it was said:

"It is true that they were at the time living upon the land with their father, but in addition to having title of record, he was claiming, and apparently in

full possession and control thereof, and the posses-
sion of appellants, if any they had, was as hidden
and secret outside of the family circle as was the un-
recorded deed, and was neither open nor notorious.

"As held in Interstate Investment Co. v. Bailey,
93 S. W. 578, 29 Ky. L. R. 468, the possession that
will render a deed champertous under the statute
(section 210) must be actual, and such as would imply
that the tenant holds against all the world, and will
acquire title if maintained long enough."

Here James Bradley, appellees' predecessor in title,
is shown to have been in actual possession of the tract of
land conveyed to him by the unrecorded instrument at
all times after its date. He resided upon it, cultivated
it, cleared, and fenced it, and had full management and
control of it. His possession of it was the most open,
notorious and hostile possible at the time the Harkins
deed was made, because he then actually lived in his own
home upon it. William Bradley is not shown to have
exercised any control whatever of the particular 100 acre
tract of land, after the conveyance to James Bradley.

This case on its facts is the very antithesis of Oliver
v. Creech's Heirs, 215 Ky. 660, where the son, claiming
under a verbal purchase from his father alleged to ante-
date the mineral deed, was present and took part in the
negotiations leading to the mineral deed, and surrendered
possession of the portion of the larger boundary on which
he lived in order that the father might put the purchaser
of the minerals in possession. The son was there held to
be estopped to claim against the purchaser of the min-
erals.

It appearing that James Bradley was in actual, open,
notorious, adverse possession of the 100 acre tract of
land after having purchased, paid for and received con-
veyance of it, at the time William Bradley conveyed the
coal and minerals in the 305 acre tract to W. S. Harkins,
the latter deed, to the extent that it purported to convey
the estate in the coal and minerals in the 100 acre tract,
was champertous and void under the express provisions
of section 210, Kentucky Statutes. The record affords
no evidence of acts, conduct or speech, or failure to act
or speak, upon the part of James Bradley that can be
held to operate to estop him and those claiming under

him. The chancellor correctly concluded that appellees own the coal and minerals in the 100 acre tract of land under the facts appearing herein.

The judgment will therefore be affirmed.